**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CRIMINAL ACTION NO.: 5:18-CR-26-TBR**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**v.**

**JAMES BRADLEY,** *et al.*                                          **DEFENDANTS**

## Memorandum Opinion & Order

This matter is before the Court upon motions by Defendants, James and Sasha Bradley, to suppress evidence sought to be introduced against them in this criminal action by the Plaintiff, the United States of America (the "Government"). (DN 34; DN 36). A suppression hearing was held on May 15, 2019 in Paducah, Kentucky. (DN 42; DN 43). The Court ordered the parties to brief the issue and each party has completed its briefing. Fully briefed, this matter is ripe for review and for the following reasons, the motions to suppress (DN 34; DN 36) are **DENIED.**

## BACKGROUND

Defendants, James and Sasha Bradley, were indicted on August 14, 2018 for possession with intent to distribute fifty grams or more of methamphetamine in violation of 18 U.S.C. § 2 and 19 U.S.C. §§ 841(a)(1) and 841 (b)(1)(A)(VIII) (Count I), and using/carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 2 and § 924(c)(1)(A) (Count II). (DN 1). The indictment followed the February 6, 2018 arrest of the Defendants on Heater Store Road in Livingston County, Kentucky. (DN 48). The Defendants now move the Court to suppress evidence arising out of the Heater Store Road encounter on February 6, 2018. The Court held a suppression hearing on May 15, 2019 in Paducah, Kentucky. At the suppression hearing, the government introduced a number of exhibits and the testimony of: (1) Detective Sergeant Ryan

1

Norman of the McCracken County Sheriff's Department; (2) Officer Daniel Cavanah of the Madisonville Police Department; (3) Detective Cory Jessup of the Kentucky State Police; and (4) Special Agent Keith Varni of the Drug Enforcement Administration. The Defendants also introduced a number of exhibits and the testimony of : (1) Detective Captain Jesse Riddle of the McCracken County Sheriff's Department; and (2) Deputy Brock Martin of the McCracken County Sheriff's Department. The evidence introduced at the suppression hearing establishes the following facts:

On February 1, 2018, law enforcement officials applied for and obtained a warrant to install a Global Positioning Satellite (GPS) tracking device on a maroon Impala registered to James Bradley. (Government's Exhibit 2). The warrant states in relevant part:

> That [Det. Sgt. Jesse Riddle] is reasonably certain and therefor believes that in McCracken County, State of Kentucky license plate 376XHE a maroon 2006 Chevrolet Impala (the subject vehicle), owned by James Bradley, is being used in an ongoing conspiracy to obtain and distribute Methamphetamine and that the use of a GPS electronic tracking device, investigators can track and observe the suspect's vehicular activity for the purpose of gaining evidence to identify the suspect's and their associates in the drug distribution business and/or additional locations, businesses, residences and facilities used to store or distribute Methamphetamine. There is a photo of the above described vehicle attached to this search warrant; taken while it was located at 3735 Metropolis Lake Road in McCracken County KY, where the target of the investigation resides.

*Id.* The affidavit upon which the warrant was issued discusses, *inter alia*, the following:

(1) James Bradley was arrested in 2012 for trafficking in methamphetamine.

(2) James Bradley was reporting a fictitious address on Glenn Street in Paducah, Kentucky to his Kentucky Probation and Parole Officer.

(3) Sasha Bradley attempted to bond Clayton Ali, who is James Bradley's son, out of jail with $24,000 after he was charged with trafficking in methamphetamine. Ali was believed by

law enforcement to be involved in the trafficking of large quantities of methamphetamines and detectives seized nearly $10,000 from him at the time of his arrest. Sasha Bradley's money was seized by police in the ongoing investigation and her father told detectives that he believed some of the money was given to her by James Bradley.

(4) Beginning on January 30, 2018, law enforcement cultivated a confidential source after he was intercepted during the delivery of approximately 81 grams of methamphetamine. The informant told the investigating officers that he had obtained methamphetamine from James Bradley on a number of occasions and traveled with him to Louisville on January 30, 2018, in the maroon Impala where James Bradley purchased two pounds of methamphetamine. The informant told the police that he had seen James Bradley with as much as five pounds of methamphetamine in the past and that James Bradley sold methamphetamine in McCracken County. Finally, the source informed the police that he owed James Bradley $1,250.00 for methamphetamine that had been seized by the police.

(5) On January 31, 2018, law enforcement coordinated, supervised, and recorded the informant repaying James Bradley the $1,250.00 drug debt for methamphetamine seized by the police. After the repayment was complete, the informant told investigating officers that James Bradley said he would be going tomorrow or the next day to obtain more methamphetamine.

The police installed the GPS tracking device on the maroon Impala on February 2, 2018 and began monitoring the vehicle's movement.

Then, on February 5 and February 6, the GPS indicated that the maroon Impala traveled to Caneyville, Upton, Glendale, Elizabethtown, and Shepherdsville Kentucky. Law enforcement prepared to begin visual surveillance. (DN 43 at 51-52, 133-34). Two officers, Special Agent Varni

and Officer Cavanah, traveled to Beaver Dam, Kentucky to try and intercept the maroon Impala and begin visual surveillance. (DN 43 at 134). The officers spotted the maroon Impala (DN 43 at 52, 134) and Varni identified James Bradley as the driver. (DN 43 at 134). The maroon Impala was closely followed by a second car. Based on the second car's license plate, the officers suspected the second car to be operated by Eric McCarty, who the officers knew to be a methamphetamine trafficker. (DN 43 at 135). The investigating officers believed the McCarty car was operating as a "tail gunner" or follow car, which is a defensive tactic commonly used by drug traffickers to avoid encounters with law enforcement. (DN 43 at 52, 136). The officers began to follow the two cars to maintain surveillance.

As the officers followed them, the maroon Impala and the McCarty car exited the interstate and began driving erratically on a series of rural backroads. (DN 43 at 189). Officers testified that they had to exceed the speed limit to keep up with the suspect cars, that the maroon Impala was being operated recklessly or carelessly on the rural roads, and that the maroon Impala was traveling at speeds that were unsafe. (DN 43 at 10, 189-90). The officers eventually lost sight of the suspect cars. (DN 43 at 189-90). About thirty seconds after losing sight of the cars, the officers came around a blind curve and saw the maroon Impala and McCarty car pulled off to the side, partially on the road and partially off the road. (DN 43 at 190). James Bradley was standing outside of the car with the door open. (DN 43 at 190).

The officers approached the suspect cars with their guns drawn. James Bradley was intercepted and held at gun point. (DN 43 at 12, 83, 129, 190). He was then patted-down, moved to the front of the maroon Impala, handcuffed, and told he was not under arrest but was being detained. (DN 43 at 190). Another officer approached from the rear passenger side, with his semi-automatic rifle in "low ready position," and ordered Sasha Bradley to "show me your hands." (DN

4

43 at 56). Sasha Bradley complied with the order, and Officer Cavanah ordered her out of the Impala. (DN 43 at 12, 55). After Sasha Bradley exited the Impala, Officer Cavanah spun her around, patted down the small of her back, placed her in handcuffs, told her she was being detained, and passed her off to Detective Norman, who moved her to the rear of the Impala. (DN 43 at 55-57, 12-13, 18, 27, 56). Norman plainly noticed the bulge of a firearm in the front of her hooded sweatshirt. (DN 43 at 12). Norman seized the firearm. (DN 43 at 12). Sasha Bradley appeared to be under the influence of methamphetamine or a similar substance based upon her unsteadiness, mannerisms, grinding of teeth, and bleeding nose. (DN 43 at 47, 57).

After the Defendants and those inside the McCarty car were detained, Varni walked around to the open passenger door of the Impala, looked into the open passenger door of the vehicle, and observed a baggie of what he suspected to be crystal methamphetamine stuck between the console and the front passenger seat. (DN 43 at 137-138). Varni pointed out the baggie to Cavanah who testified that the substance appeared to be consistent with the shape, color, and packaging of methamphetamine. (DN 43 at 19-20). After Varni and Cavanah observed the baggie in plain view from outside of the Impala, the officers searched the car and found approximately 200 grams of suspected methamphetamine and more than $3,000.00 in U.S. currency. (DN 43 at 61, 139) (Government's Exhibit 5).

After discovering the methamphetamine and U.S. currency in the Impala, a K9 drug dog arrived and conducted a secondary search of the vehicle to ensure that law enforcement had not overlooked any hidden compartments containing methamphetamine. (DN 43 at 61, 139-140). The drug-dog alerted on the Impala but the officers did not find additional methamphetamine. (*Id.* at 61, 139-43). The officers arrested James Bradley for methamphetamine related offenses and for being a convicted felon in possession of a firearm. (Government Exhibits 3 and 4). The officers

arrested Sasha Bradley for methamphetamine offenses and for possessing a concealed firearm. (*Id.*). The Defendants were indicted by the Grand Jury for possession with the intent to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. Section 841(a)(1) and 841(b)(1)(A)(Viii) and for use/carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1)(A). (DN 1). The Grand Jury also indicted James Bradley for being a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1), 18 U.S.C. 924(a)(2), and 18 U.S.C. 924(e). (*Id.*).

## LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. Consistent with this, constitutional jurisprudence provides "the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). In order to further protect individuals' privacy interests, the Fourth Amendment demands that search warrants, when issued, are only provided upon a showing of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Probable cause justifying the issuance of such a search warrant exists where, taking the totality of the circumstances, the affidavit supporting the warrant provides the issuant Magistrate with a "substantial basis...to believe 'there is a fair probability that contraband or evidence of illegal activity will be found in a particular place.'" *United States v. McNally*, 327 F. App'x 554, 556 (6th Cir. 2009) (quoting *Gates*, 462 U.S. at 238). Moreover, in order "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found in a

particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). This requirement demands "a nexus between the place to be searched and the evidence sought." *Id.*

Thus, the affidavit which supports the search warrant must actually "contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (citing *Whiteley v. Warden*, 401 U.S. 560, 564, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971)). Also, "[t]he supporting facts in an affidavit need not be based on direct knowledge and observations of the affiant, but may come from hearsay information supplied by an informant." *Id.* (citing *Jones v. United States*, 362 U.S. 257, 269-70, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960)). The decision of a Magistrate who initially issued the warrant will be reversed by this Court only if her "determinations were arbitrarily exercised." *United States v. Archibald*, 685 F.3d 553, 557 (6th Cir. 2012).

The Sixth Circuit has interpreted the Supreme Court's decision in *Illinois v. Gates*, and has determined that a court, in conducting a review of the sufficiency of the evidence supporting probable cause, is "limited to examining the information contained within the four corners of the affidavit" in light of the totality of the circumstances. *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009). In order to deter future violations of the Fourth Amendment, the typical remedy for searches made with a defective warrant is suppression of that evidence. *See United States v. Woodbury*, 511 F.3d 93, 99 (1st Cir. 2007). Notably though, suppression is not always warranted and, depending upon the circumstances, evidence may be saved where an officer acts objectively in good faith in her execution of an otherwise defective warrant. *United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). This means that, in situations where "evidence [is] obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the "marginal or nonexistent benefits [of suppression]...cannot justify the substantial costs of

exclusion." *Id.* In such a case, although probable cause is lacking, the fruits of the search need not be suppressed.

"When considering whether to suppress evidence in a criminal case, a court addresses a mixed question of law and fact." *Thomas v. Arnold*, 696 F.Supp.2d 882, 886 (N.D. Ohio 2010) (citing *United States v. Hurst*, 228 F.3d 751 n.1 (6th Cir. 2000)). "Therefore, a court can appropriately weigh evidence and determine credibility when deciding whether to suppress evidence." *Id.*

## DISCUSSION

Whether the Defendants' motion to suppress should be granted depends on the determination of four important issues. First, the Court must determine whether the GPS warrant, and the affidavit supporting the GPS warrant, was proper. Second, the Court must determine whether the encounter on Heater Store Road initially was a traffic stop, an investigatory detention, or a warrantless arrest. Third, the Court must determine whether the pat-down of Sasha Bradley was proper. Finally, if the initial encounter was an investigatory detention, the Court must determine whether the Defendants were detained for an unconstitutionally long period of time.

### (I)  The GPS warrant was proper.

Defendants argue that the search warrant for the GPS tracker on the maroon Impala was unlawfully obtained. In evaluating an affidavit's sufficiency, the Court must determine "whether the magistrate judge had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) (citing *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

Probable cause requires "'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). That is, the affidavit must suggest "reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought and not merely that the owner of property is suspected of crime." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quotations omitted). In making this inquiry, "[t]he issuing judge or magistrate may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inference about where evidence is likely to be kept." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 644 (6th Cir. 2003) (quotations omitted).

Affidavits are commonly drafted by "nonlawyers in the haste of a criminal investigation"; as such, the Supreme Court has recognized that "technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area." *Gates*, 462 U.S. at 235. Rather, "the affidavit should be reviewed in a commonsense rather than a hypertechnical manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause rather than engaging in line-by-line scrutiny." *Woosley*, 361 F.3d at 926. The district court tasked with this determination must afford "great deference" to the reviewing judge's probable cause determination, reversing it "only if the magistrate arbitrarily exercised his discretion." *Id.*

In this case, the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited. The affidavit stated that detectives had received numerous tips alleging that James Bradley was selling methamphetamine and that Sasha Bradley was involved. The tips also alleged that James Bradley

was reporting a false address to his probation officer and that he had recently tested positive for methamphetamine. The affidavit explained that investigating officers cultivated an informant who told them that he had purchased methamphetamine from James Bradley on multiple occasions, that he had traveled with James Bradley to Louisville to purchase two pounds of methamphetamine and brought it back to McCracken County to sell in the maroon Impala, that he had seen James Bradley in possession of more than five pounds of methamphetamine, and that the informant owed James Bradley $1,250.00 for methamphetamine. The affidavit also explains that the investigating officers coordinated a meeting between the informant and James Bradley where the informant paid James Bradley the $1,250.00 he owed. Finally, the affidavit explains that the informant told investigating officers that "[James] Bradley told them it would be tomorrow or the next day referring to when Bradley would get them more methamphetamine." Considering these facts, the issuing magistrate had probable cause to believe that methamphetamine would be found in the maroon Impala.

Defendants also argue that the GPS warrant was unconstitutional because the magistrate's determination was incorrect from the outset due to it being based on incomplete and inaccurate information provided to him by Detective Jesse Riddle. (DN 52 at 2). Defendants argue that the affidavit contains "deliberate falsehood[s] or [a] reckless disregard for the truth[.]" *Franks v. Delaware*, 438 U.S. 154, 171 (1978). First, Defendants assert that the officers failed to provide any indication of the informant's reliability in the affidavit. Because he police coordinated and recorded a drug-debt repayment that provided the magistrate with sufficient indicia of reliability to support a finding of probable cause, the Court disagrees.

Second, Defendants argue that the officers' decision to exclude from the affidavit the fact that they promised not to prosecute the informant in exchange for his cooperation was a "reckless

disregard for the truth" in violation of *Franks*. Defendants cite to *United States v. Hammonds* and argue "This is not a case in which an officer made a small error in an affidavit, when applying for a search warrant. The number of falsehoods and half-truths told are substantial and reflect, at the very least, a reckless disregard for the truth." (DN 52 at 4) (quoting *United States v. Hammond*, 351 F.3d 765, 774 (6th Cir. 2003)). In *Hammond*, the court held that the affidavit violated *Franks* where:

> Detective Engle by his own admission was informed by Deputy Keeney of Holt's tip within a day of filling out the application for the warrant in this case, yet Engle implied in his affidavit that he drove by Hammond's property in order to verify Holt's tip in April. Detective Engle stated that Holt informed Deputy Keeney that the marijuana was located in a "side room" of the building, yet Deputy Keeney testified at the *Franks* hearing that he did not recall such a statement. Detective Engle stated in his affidavit that he "verified [Holt's] complaint" when he drove by Hammond's property, yet he did not see any marijuana growing or for that matter any indications of criminal activity. All he was able to "verify" was that a Glen Hammond lived in Rockcastle County off of KY 1955. Detective Engle stated with certainty that there was no trailer on the Hammond property, yet there was a trailer. The power records were not for the buildings they were attributed to in the affidavit. The building that Engle claimed to have no windows, did in fact have windows.

*Id.* The omitted fact that the police promised not to prosecute the informant in this case does not rise to the level of falsehood present in *Hammond* and the affidavit upon which the GPS warrant was issued does not violate *Franks*.

Finally, the Defendants argue that the information underlying the affidavit was not credible because the Defendants never actually traveled to Louisville and because it was more than a day or two when they traveled to Shepherdsville. But these inaccuracies do not amount to being "untruthful" under the standard of *Franks*. The Fourth Amendment demands a truthful showing sufficient to comprise probable cause. In *Franks*, the Supreme Court explained,

> [t]his does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may founded upon hearsay and

upon information received from informants, as well as upon information in the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks*, 438 U.S. at 165. The information contained in the affidavit was truthful under the *Franks* standard and was sufficient to support a finding of probable cause.

**(II)     The initial encounter on Heater Store Road was an investigatory detention based upon reasonable suspicion that the Defendants were, at that time, engaged in drug trafficking.**

Defendants argue that the events of February 6, 2018 constitute a warrantless arrest not supported by probable cause. The government argues that the encounter on Heater Store Road began as an investigative detention and that the officers did not arrest the Defendants until after they saw the methamphetamine in the maroon Impala and therefore had probable cause. The Court concludes that the encounter on Heater Store Road began as an investigatory detention and that Defendants were not arrested until after the concealed firearm and narcotics were found.

The Sixth Circuit Court of Appeals has identified three types of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if nonconsensual, must be supported by a reasonable articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)). If an officer has a reasonable and articulable suspicion that someone has been, or is about to be, engaged in criminal activity, such person may be stopped and briefly detained. *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)) "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and

objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Baldwin*, 114 Fed. App'x 675, 679 (6th Cir. 2004) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

In this case, a reasonable amount of force, under the circumstances, was used to detain the Defendants while the officers conducted a brief investigation. "[E]ven where reported crimes do not directly involve violence, they may be so closely associated with violence as to support an inference of dangerousness that justifies intrusive measures during the investigatory stop." *Al-Menhali v. Mariott International, Inc.*, 2018 WL 7435976, *10 (N.D. Ohio Sept. 25, 2018) (citing *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015); *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (e.g. methamphetamine manufacture). The "mere use . . . of force in making a stop will not necessarily convert a stop into an arrest. . . . [When the] surrounding circumstances give rise to a justifiable fear for personal safety, a seizure effectuated with weapons drawn may properly be considered an investigative stop." *United States v. Hardnett,* 804 F.2d 353, 357 (6th Cir. 1986) (citing *United States v. Greene,* 783 F.2d 1364, 1367–68 (9th Cir.1986)). The Sixth Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop. *See, e.g., Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 815 (6th Cir.1999) (finding that the use of handcuffs does not exceed the bounds of a *Terry* stop); *Hardnett,* 804 F.2d at 357 (holding that approaching a defendant with a firearm drawn was reasonable as the officer had reason to believe the suspect was armed).

The encounter on Heater Store Road was a fluid and dynamic situation that unexpectedly developed. The officers were unable to keep up with the maroon Impala and the tail-gunner car due to Defendants' elusive driving on rural Heater Store Road. As the officers rounded a blind curve they came upon the maroon Impala and tail-gunner car parked partially in the road, with

James Bradley standing outside the car. The officers had reasonable suspicion that both cars were engaged in drug trafficking at the time and relied on their experience and training that drug traffickers often carry firearms. This was potentially a dangerous environment and the officers quickly responded to secure the area. In this case, the officers used reasonable force due to the justifiable fear for the safety of all individuals who were present during the encounter on Heater Store Road.

James Bradley argues that he was placed under arrest without probable cause when the officers drew their firearms, handcuffed him, moved him to the front of his vehicle, and searched him for weapons. (DN 49 at 14). James Bradley argues that his case is substantially similar to *United States v. Lopez-Arias*, 344 F.3d 623 (6th Cir. 2003). In *Lopez-Arias*, DEA agents pulled over the defendants and

> [t]he four DEA agents, with weapons drawn, ordered defendants to exit the [car]. The DEA agents then handcuffed defendants and placed them into separate DEA vehicles. The DEA agents drove the defendants from the scene of the stop on the street to an adjacent convenience store parking lot, where they were removed from the DEA vehicles, read their *Miranda* rights, and questioned separately.

*Id.* at 626. Therefore, in *Lopez-Arias* the defendants were:

> (1) stopped by four DEA agents brandishing firearms, (2) handcuffed, (3) placed into the backseats of separate DEA vehicles, (4) transported from the scene of the stop, (5) read their *Miranda* rights, and (6) questioned.

*Id.* at 628. In this case, neither James Bradley nor Sasha Bradley were placed into a police vehicle, transported from the scene of the stop, read their *Miranda* rights, or questioned during the relevant portion of the encounter. Only two of the *Lopez-Arias* factors are present in this case. Although there is no bright line or "litmus-paper test" that distinguishes an investigative detention from an arrest, the Court concludes that the *Lopez-Arias* factors—considered alongside other relevant facts and within the context of the encounter—suggest that the officers did not arrest Defendants until

after they found the methamphetamine and firearm, at which point the officers had probable cause. *See Florida v. Royer*, 460 U.S. 491, 506 (1983) (stating that there is no "litmus-paper test" for distinguishing when a seizure exceeds the bounds of an investigative stop).

Sasha Bradley argues that she was placed under arrest without probable cause when the officers ordered her to show her hands, ordered her to exit the maroon Impala, patted her down, and placed her in handcuffs. (DN 48 at 11). As with James Bradley, Sasha Bradley was only subjected to two of the *Lopez-Arias* factors: (1) stopped by armed law enforcement officers, and (2) handcuffed. Sasha Bradley supports her argument by citing to *United States v. Richardson*, 949 F.2d 851 (6th Cir. 1991). In *Richardson*, four officers placed the defendant in the back seat of an unmarked police car and questioned him. After being questioned in the back seat of the police vehicle, Richardson consented to a search of his locker and the officers found contraband. The *Richardson* court concluded that "[w]hen the agents placed Richardson in the back of the police car, they went beyond the bounds of *Terry*. . . . Placing Richardson in the police cruiser not only constituted a seizure, as was mentioned earlier, but also crossed the line into an arrest." *Richardson*, 949 F.2d at 857. Unlike Richardson, Sasha Bradley was not placed into a police car during the relevant portion of the encounter. Furthermore, the Court concludes that officers acted reasonably considering the context of the encounter. The officers reasonably believed that they were entering a potentially dangerous situation when they approached the two vehicles, that were unexpectantly stopped in the road, and were reasonably suspected of being presently involved in drug trafficking activities. This is especially true because James Bradley had already exited the maroon Impala when the police arrived. For the foregoing reasons, the initial encounter on Heater Store Road was an investigatory detention based upon reasonable suspicion that the Defendants were, at that time, engaged in drug trafficking.

### (III)    The pat-down of Sasha Bradley, which uncovered a concealed firearm, was proper.

Soon after encountering Defendants on Heater Store Road, the investigating officers ordered Sasha Bradley to get out of the maroon impala, patted her down, placed her in handcuffs, and then discovered a firearm in the front pocket of her hooded sweatshirt. (DN 43 at 12, 55-56). Sasha Bradley argues that the investigating officers lacked reasonable suspicion to search her. The Court finds that the officers had a reasonable suspicion that Sasha Bradley was armed and dangerous. Therefore, the pat-down did not violate Sasha Bradley's rights under the Fourth Amendment.

During an investigative detention, or a *Terry* stop, an officer may perform a pat-down or frisk when he has a reasonable suspicion that the individual to be searched may be armed and dangerous. *United States v. Pendeleton*, No. 3:15-CR-116-CRS, 2017 WL 2722305, * 6 (W.D. Ky. June 23, 2017) (citing *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016); *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). "Reasonable suspicion is based on the totality of the circumstances . . . and it exists if a reasonably prudent [person] in the circumstances would be warranted in the belief that his . . . safety or that of others was in danger." *Id.* (citing *United States v. Noble*, 762 F.3d 509, 521-22 (6th Cir. 2014); *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). The determination of whether, in the totality of the circumstances, reasonable suspicion exists in any given case is a fact-specific analysis and the Supreme Court has suggested that "two decisions when viewed together may usefully add to the body of law on the subject." *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 275 (2002); *Ornelas v. United States*, 517 U.S. 690, 697-98 (1996) (internal quotation marks omitted)). The Court will follow the Supreme Court's suggestion and

compare the facts of this case with the facts that were present in *United States v. Pacheo* and *United States v. Noble* to determine whether the pat-down of Sasha Bradley was unconstitutional.

A. *United States v. Noble*

In *United States v. Noble*, police officers received a tip regarding the transport of methamphetamine from Louisville to eastern Kentucky. 762 F.3d at 514. The tip stated that the methamphetamine would be transported using a white Jeep Cherokee. *Id.* Based on the tip, the officers "established surveillance along the [Interstate] 75 corridor—or [Interstate] 64 corridor . . . . going towards Louisville in an attempt to locate the white Jeep Cherokee. . . ." *Id.* (citation omitted). The officers conducted surveillance all afternoon but they did not locate the white Jeep Cherokee. *Id.* Later that evening, the officers informed the cooperating defendant—the source of the tip—that they were unable to locate the white Jeep. *Id.* The informant then informed the officers that it was possible the methamphetamine would be transported in a "dark-colored Chevrolet Tahoe" instead of the white Jeep. *Id.* The officers located a dark-colored Chevrolet Tahoe, observed the Tahoe commit a traffic violation, and stopped the Tahoe. *Id.* at 514-15. The officer who conducted the traffic stop did not know who was in the Tahoe at the time of the stop. *Id.* at 515. The officer conducted a pat-down of Noble, who was a passenger in the Tahoe. *Id.* The government argued that the pat-down was justified for three reasons: (1) Noble was nervous; (2) Noble was present in a car suspected of involvement in drug trafficking; and (3) the officer knew, from his training and experience, that individuals in drug trafficking are generally armed. *Id.* at 522.

The Sixth Circuit Court of Appeals concluded that—although it was a close case—the officer lacked reasonable suspicion to frisk Noble. *Id.* at 518-19. In reaching its conclusion, the

*Noble* court reasoned that "nervousness—even extreme nervousness—'is an unreliable indicator' of someone's dangerousness, 'especially in the context of a traffic stop.'" *Id.* at 522. Furthermore, the *Noble* court gave little weight to Noble's nervousness because the officer did not immediately frisk him. *Id.* at 523.

Second, the *Noble* court reasoned that "a person's mere presence in a car, which the police believe is connected to drug trafficking, is not an automatic green light for frisking that person." *Id.* (citing *United States v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985)). The court concluded that the officers lacked sufficient articulable reasons to believe that Noble was armed and dangerous. Finally, although the Court recognized the rule that "a police officer, like Officer Ray, can 'rely on his [or her] training and experience that drug dealers frequently carry weapons' . . . we have always required some corroboration that particular individuals are involved in dealing drugs before allowing a frisk for weapons." *Id.* at 524 (citing *United States v. Branch*, 537 F.3d 582, 589 (6th Cir. 2008); *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004); *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001)). The officer who frisked Noble did not recognize the Tahoe's driver as a drug trafficker, "nor did he have any idea who Noble was prior to the frisk." *Id.* The *Noble* court concluded that the government's justifications for the pat-downs were weakly supported and therefore held that the officer did not have reasonable suspicion to frisk Noble. *Id.* at 525.

B. *United States v. Pacheco*

In *United States v. Pacheco*, police officers received a tip from a confidential source about "subjects moving medium to large quantity narcotics in and around the Kimberly Parkway area" of Columbus, Ohio. 841 F.3d 384, 387 (6th Cir. 2016). The informant told Detective Best that "two Hispanic men in a silver Lincoln Aviator were moving narcotics from the Chatham Village

apartment complex in the Kimberly Parkway area. *Id.* Detective Best had never met the informant and did not know whether he was reliable. *Id.* Detective Best began surveillance of the area, and spotted a vehicle matching the informant's description. *Id.* Detective Best pulled up beside the Lincoln Aviator and observed what he believed were two Hispanic males in the vehicle. *Id.* at 387-88. Best called a patrol officer who followed the Aviator until it committed a traffic violation. *Id.* After the patrol officer observed the Aviator commit a traffic violation, he pulled the vehicle over into a gas station parking lot and approached it. *Id.*

After approaching the Aviator, the patrol officer asked Pacheco—who was in the passenger seat of the Aviator—for identification. *Id.* at 388. In response, Pacheco began rummaging through the glove compartment and other areas of the interior of the vehicle but did not produce his identification. *Id.* Pacheco appeared extremely nervous and avoided eye contact. *Id.* The officer then instructed Pacheco to exit the vehicle, frisked him, and found cocaine and currency. *Id.*

The Sixth Circuit Court of Appeals concluded that the pat-down was justified based on three factors: (1) the informant's tip was more detailed and further corroborated than the tip in *Noble*; (2) Pacheco was extremely nervous and not responsive to the patrol officer's commands; and (3) the traffic stop was conducted at night in a neighborhood known for gang violence and drug trafficking. *Id.* at 392-94. Most importantly to the case before this Court, the *Pacheco* court explained that the detailed and further corroborated tip "made it more likely that the two men inside the Aviator were engaged in narcotics trafficking and thus—given the strong association between drug dealing and firearms—more likely that they were potentially armed." *Id.* at 392.

C. *Noble* and *Pacheco* compared to this case.

In this case, the informant identified the Defendants by name and provided an accurate description of Defendants' vehicle. Furthermore, the police coordinated an undercover meeting

between the informant and the Defendants. At the meeting—which was recorded and occurred inside the Defendants' home—the informant paid James Bradley $1,250.00 that the informant owed him for methamphetamine. Upon reviewing the recording of the meeting and considering it in context and alongside the testimony produced at the suppression hearing, the Court finds that this undercover meeting significantly increases the informant's reliability.

The investigating officers in this case knew or had reason to believe that (1) James Bradley had been previously been convicted for trafficking methamphetamine, (2) James Bradley had provided the informant with a substantial amount of methamphetamine on January 31, 2018 and that the informant had paid $1,250.00 for the methamphetamine under police supervision; (3) the informant and James Bradley had gone together to Louisville on multiple occasions in the maroon Impala to purchase methamphetamine and had returned to sell the drugs in McCracken county; and (4) James Bradley had provided his parole officer with a false address. Officers had also received tips from other sources alleging that James Bradley was selling Methamphetamine and that Sasha Bradley was involved. Furthermore, the officers learned from the GPS that Defendants were returning from Shepherdsville, Kentucky. Detective Varni testified at the suppression hearing that Shepherdsville is a "very common mid transshipment point[] for Louisville sources to meet Western Kentucky drug dealers. . . ." (DN 43 at 159). From physical surveillance, the officers learned that the Defendants were using a tail-gunner, exceeding the speed limit, and driving recklessly on rural roads in an apparent attempt to evade law enforcement. After speeding away from the unmarked police vehicles, the maroon Impala and the tail-gunner car stopped, partially on the side of the road, around a blind curve on a rural road. Finally, Sasha Bradley appeared to be under the influence of methamphetamine or a similar substance due to her unsteadiness, mannerisms, grinding of teeth, and bleeding nose. (DN 43 at 47, 57).

In the totality of the circumstances, it was reasonable to perform a pat-down on Sasha Bradley. First, the officers had reliable information that the Defendants were engaged in drug trafficking because of the informant's tips, the use of a tail-gunner, the false address, and Sasha Bradley's appearance of intoxication. In *United States v. Jacob*, the Sixth Circuit Court of Appeals explained that "officers who stop a person who is 'reasonably suspected of carrying drugs' are 'entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions,' and to take reasonable measures to protect themselves." 377 F.3d 573, 579-80 (6th Cir. 2004) (quoting *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (finding it reasonable for agents, after stopping a person suspected of drug trafficking, to draw their weapons to order a suspect out of his car and to frisk and handcuff the suspect); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999) (finding that the use of handcuffs does not exceed the bounds of a *Terry* stop)). The officers in this case reasonably suspected Sasha Bradley to be carrying drugs and appropriately relied on their experience and training in concluding that weapons are frequently used in drug transactions. Therefore, the pat-down was a reasonable measure to protect the officer's safety and did not violate the Fourth Amendment.

Unlike Noble, Sasha Bradley was not merely present in the car of a suspected drug dealer. The officers had tips identifying her as being involved in the drug trafficking operation and she appeared to be under the influence of methamphetamine when the officers ordered her out of the Impala. And unlike the officer in *Noble*, the officers in this case knew who Sasha Bradley was and reasonably suspected her to be a drug trafficker. Finally, the informant's description of the Defendants' vehicle and his description of the Defendants was more specific and reliable than the tips in either *Noble* or *Pacheco*. For the foregoing reasons, the pat-down of Sasha Bradley was constitutional.

**(IV) The Defendants were not detained for an unconstitutionally long period of time.**

Defendants argue that an unreasonable delay of an hour and a half occurred before the drug dog arrived and that the officers' testimony that they found the drugs in plain view before the dog's arrival is not credible. This argument is unpersuasive for three reasons. First, the concealed firearm, which established probable cause to arrest, was found soon after the Defendants were detained and long before the drug dog arrived. (DN 43 at 99-100, 116-117). Second, testimony at the suppression hearing establishes that the methamphetamine was found in plain view soon after Sasha Bradley was removed from the maroon Impala. (DN 43 at 137-138). Finally, the officers photographed the methamphetamine in the marron Impala between 3:15 and 3:17 p.m., approximately thirty-five minutes after the officers arrived at the scene and approximately fifty minutes to an hour before the Defendants allege the drug dog arrived. (DN 43 at 76, 117-121, 169). Because the officers found the firearm and methamphetamine within approximately thirty-five minutes of detaining the Defendants, it is immaterial how long it took the drug dog to arrive. The violation time is listed on the citations as 3:11 p.m. This time is consistent with the Defendants' timeline for when the firearm was located—approximately thirty-five minutes after arriving on the scene—and when the Defendants allege the pictures of the Methamphetamine were taken in the car—between 3:15 and 3:17 p.m. Thirty to thirty-five minutes is a reasonable time for an investigative detention in the context of this case.

At the suppression hearing, Norman, Cavanah, Jessup, and Varni each testified that the officers found the methamphetamine in plain sight prior to the drug dog's arrival. (DN 43 at 49, 60-61, 116, 142). Martin testified that he was unsure of the chronological order of events but that he was told that there were drugs in plaint view. (DN 43 at 197). No witnesses at the suppression

hearing testified that the drugs were found after the arrival of the drug dog. Defendants identify that there are inconsistencies between the testimony of the officers at the suppression hearing and with reports and testimony created prior to the hearing. More specifically, the Defendants identify that none of the reports or testimony on the record mention finding the drugs in "plain sight." The Defendants also argue that the reports and testimony formulated prior to the suppression hearing suggest a timeline where the drugs were not found until after the drug dog had arrived. Although it is somewhat confusing why the officers did not mention "plain view" in their reports following the arrest and the most natural reading of the pre-suppression hearing testimony and reports suggests a timeline whereby the dog arrives before the drugs were found, the Court nevertheless is persuaded by the consistent testimony of Jessup, Norman, Varni, and Cavanaugh and by their answers upon cross-examination that the officers found the methamphetamine in plain sight shortly after Sasha Bradley exited the maroon Impala.

Even assuming that the drugs were not found prior to the arrival of the dog, the Defendants' argument fails. The Defendants argue—and testimony from the suppression hearing supports— that the officers photographed the methamphetamine in the maroon Impala at 3:15 p.m. (DN 43 at 76, 117-121, 169). And assuming that the "dirt spots" in the passenger seat of the maroon Impala is a paw-print as Defendants suggest, then the dog necessarily must have arrived at the scene by 3:15 p.m. Not only is this thirty to thirty-five minute period of detention consistent with the 3:11 violation time listed on the citations, but it is also a reasonable period of detention under the circumstances. If the photographs were taken at 3:15 p.m., and the Defendants argue that they were, then one of two scenarios must be true: either (1) the officers found the methamphetamine, photographed it, then called the dog for a secondary search; or (2) the drug dog arrived prior to 3:15, alerted on the car, and then the officers photographed and confiscated the methamphetamine.

Neither scenario results in an unconstitutional period of detention because thirty to thirty-five minutes is reasonable in the context of this case.

Although the Defendants argue that the drug dog did not arrive until one and a half hours after the first encounter, no witness was able to say what time the drug dog arrived with any confidence at the suppression hearing. When Jessup was asked "how long after 3:11 p.m. the drug dog arrived" he responded "I would say longer than [ten minutes], but I'm not exactly sure. . . . I have no idea." (DN 43 at 116). And when asked if the drug dog arrived prior to 4:10, Jessup answered "I don't know. I really don't know what time the drug dog arrived. It's from another agency. I don't have their card or anything like that, so . . . ." (DN 43 at 117). When asked what time the dog arrived on the scene, Varni answered "I cannot say exactly what time it arrived" but gave a "rough estimate" that it arrived sometime between 3:17, when the last picture was taken, and 4:13, when the maroon Impala was moved. (DN 43 at 150, 155). When asked if he had any way of estimating when the dog arrived, Norman answered "No, sir, I don't." (DN 43 at 30). And when Martin was asked how long it took the drug dog to get to the scene, Martin answered "I really don't know, it's been so long ago, and I couldn't honestly tell you if it was 5 minutes or 30 minutes or how long it was" and "I truthfully couldn't give you an estimate on that, no." (DN 43 at 195-96). There is no reliable evidence on the record to establish what time the drug dog arrived on the scene.

The Defendants' reliance in *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) is misplaced. James Bradley cites to *Davis* to support his argument that "[a]n hour to an hour-and-a-half delay has been held to be constitutionally unreasonable and a violation of the Fourth Amendment. (DN 49 at 23). In *Davis*, law enforcement officials pulled over the defendant's vehicle for a traffic violation in the course of conducting a drug trafficking investigation. *Davis*,

430 F.3d at 349. Approximately thirty minutes after the traffic stop, a drug dog arrived on the scene, sniffed the defendant's car, but did not indicate that drugs were present. *Id.* at 350. The officials proceeded to call a second drug dog, to try again. *Id.* The second drug dog arrived about an hour later, sniffed the defendant's car, and indicated that drugs were present. *Id.* The Court concluded: "Because we believe that the police lacked reasonable suspicion to detain Davis once the first drug-sniffing dog failed to alert, we agree that the search of Davis's vehicle violated the Fourth Amendment." *Id.* at 351. In reaching this conclusion, the court explained that "Davis concedes, and we agree, that the police had reasonable suspicion to detain Davis for the additional approximately thirty to forty-five minutes it took the police to bring the first drug-sniffing dog to the scene and have the dog check the vehicle for the presence of narcotics." *Id.* at 354. Further, the court explained,

> There is also no evidence in the record that the additional approximately thirty-minute delay of Davis and his vehicle while the first drug-sniffing dog was located and procured was unreasonable in light of the officers' reasonable suspicions. Thus, the use of a well-trained drug-sniffing dog that was brought to the scene within a reasonable period after the initial traffic stop was a permissible means of determining whether the police were correct to suspect that Davis was in possession of narcotics.

> Once the drug-sniffing dog was brought to the scene and failed to alert positively to the presence of narcotics in the vehicle, the officers' suspicions that Davis was in possession of narcotics were dispelled. . . Based upon this information, there were no grounds for the police to continue to believe that the vehicle contained narcotics after [the drug-sniffing dog] failed to alert.

*Id.* at 355-56. In *Davis*, the first drug dog's failure to alert on the car caused the investigative purpose of the stop to evaporate. In this case, there was no such intervening event. The officers had reasonable suspicion that the Defendants were engaged in drug trafficking activities from the beginning of the Heater Store Road encounter until the firearm and methamphetamine was located. Furthermore, the *Davis* court concluded that thirty to forty-five minutes was a reasonable period of time to detain the defendant under circumstances that are similar to those in this case. If the

drugs were photographed at 3:15 p.m., and all evidence on the record suggests that they were, then the Defendants were only detained for approximately thirty-five minutes before the officers developed probable cause to arrest. For these reasons, the Court is persuaded by *Davis* that the period of investigative detention was reasonable in this case.

The Defendants' reliance in *United States v. Place*, 462 U.S. 696 (1983) is also misplaced. James Bradley cites to *Place* to support his argument that a ninety-minute detention is unreasonable. (DN 49 at 24). In *Place*, the Supreme Court held that a ninety-minute detention of the defendant's luggage while waiting for a drug dog was a violation of the defendant's Fourth Amendment rights. 462 U.S. at 709-710. Defendants argue, therefore, that their "detention for an hour and half before the drug dog's arrival on February 6, 2018, was also constitutionally unreasonable, and all evidence flowing from that delay must be suppressed." (DN 49 at 24). In this case, however, the law enforcement officers found a concealed firearm in Sasha Bradley's pocket and saw methamphetamine in plain sight in the maroon Impala within approximately thirty-five minutes of arriving on the scene. Under the circumstances of this case, thirty-five minutes is a reasonable period of detention. Because the Defendants were only detained for thirty-five, not ninety, minutes prior to the development of probable cause, *Place* is unpersuasive.

## ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED,** Defendants' motions to suppress (DN 34; DN 36) are **DENIED.**

**Thomas B. Russell, Senior Judge**
**United States District Court**

August 26, 2019

26